# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-_____-_____

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff,

v.

MILE HI FOODS, CO.; MILE HI EMPLOYEE GROUP, INC.; MILE HI BAKERY, INC., a/k/a COLORADO BAKERY, LLC, a/k/a BIMBO QSR COLORADO, LLC; MILE HI CORPORATE SERVICES, LLC; AND MILE HI WAREHOUSING & LOGISTICS, CO.,

Defendants.

## COMPLAINT

## NATURE OF THE ACTION

This is an action under Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991 to correct unlawful employment practices on the basis of sex, race, color, national origin, and retaliation, and to provide appropriate relief to Marianne Apodaca as well as female, Black, African American, and Afghan aggrieved individuals. As alleged with greater particularity below, the highest-level executives of the Mile Hi group of companies issued and followed discriminatory hiring directives. These directives included a handwritten note from the CEO to not hire beyond a certain number of Black applicants because he believed that Black employees are "lazy" and quit after a few days, instructions to not hire women for warehouse jobs because he believed that women were not effective at manual labor and would distract other male workers, and directions to stop hiring Afghan applicants for bakery jobs because he believed that there were too many "Afghanistans" employed in the Bakery. When Marianne Apodaca, the Human Resources Manager, opposed these discriminatory directives, Mile Hi

engaged in unlawful retaliation by harassing and ultimately discharging her.

## **JURISDICTION AND VENUE**

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to Sections 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§§ 2000e-5(f)(1), (3), ("Title VII") and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2. The employment practices alleged to be unlawful were and are now being committed within the jurisdiction of the United States District Court for the District of Colorado.

## **PARTIES**

3. Plaintiff, the Equal Employment Opportunity Commission (the "Commission"), is the agency of the United States of America charged with the administration, interpretation and enforcement of Title VII and is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. §§ 2000e-5(f)(1), (3).

4. At all relevant times, Defendant, Mile Hi Foods, Co., a Colorado corporation, has continuously been doing business in the State of Colorado and the City of Denver, and has continuously had at least 15 employees.

5. At all relevant times, Defendant, Mile Hi Employee Group, Inc., a Colorado corporation, has continuously been doing business in the State of Colorado and the City of Denver, and has continuously had at least 15 employees.

6. At all relevant times, Defendant, Mile Hi Bakery, Inc., a Colorado corporation, has continuously been doing business in the State of Colorado and the City of Denver, and has continuously had at least 15 employees.

7. At all relevant times, Defendant, Mile Hi Corporate Services, LLC, a Colorado

corporation, has continuously been doing business in the State of Colorado and the City of Denver, and has continuously had at least 15 employees.

8. At all relevant times, Defendant, Mile Hi Warehousing & Logistics, Co., a Colorado corporation, has continuously been doing business in the State of Colorado and the City of Denver, and has continuously had at least 15 employees.

9. At all relevant times, Defendants Mile Hi Foods, Co., Mile Hi Employee Group, Inc., Mile Hi Bakery, Inc., Mile Hi Corporate Services, LLC, and Mile Hi Warehousing & Logistics, Co. (collectively "Defendants" or "Mile Hi") have continuously been employers engaged in an industry affecting commerce under Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

## ADMINISTRATIVE PROCEDURES

10. More than thirty days prior to the institution of this lawsuit, Marianne Apodaca filed a charge with the Commission alleging violations of Title VII by Defendants.

11. On April 23, 2024, the Commission issued a Letter of Determination to Defendants finding reasonable cause to believe that Title VII was violated.

12. The EEOC's Letter of Determination invited Defendants to join with the Commission in informal methods of conciliation to endeavor to eliminate the unlawful employment practices and provide appropriate relief.

13. The EEOC and Defendants participated in the conciliation process.

14. On August 14, 2024, the Commission issued a Notice of Failure of Conciliation advising Defendants that the Commission was unable to secure from Defendants a conciliation agreement acceptable to the Commission.

15. All conditions precedent to the institution of this lawsuit have been fulfilled.

## STATEMENT OF CLAIMS

16. Since at least 2015, Defendants have engaged in unlawful employment practices in violation of Sections 703(a), 704(a), 709(c) of Title VII, 42 U.S.C. §§ 2000e-2(a), 2000e-3(a), and § 2000e-8(c).

17. Since at least 2015 and continuing to present, Defendants engaged in a pattern or practice of denying employment to female applicants for warehouse and driving positions because of their sex.

18. Since at least 2015 and continuing to present, Defendants denied employment to female applicants because of their sex.

19. Since at least 2015 and continuing to present, Defendants denied employment to Black and/or African American applicants because of their race and/or color.

20. Since at least 2015 and continuing to the present, Defendants denied employment to Afghan applicants for positions in the Bakery because of their national origin.

## Mile Hi

21. Defendants are headquartered in Denver, Colorado.

22. Defendants produce baked goods for national chain restaurants, distribute supplies to fast food restaurants, and perform warehousing and delivery services for food suppliers and distributors.

23. Defendants share common ownership.

24. Defendants have been owned and operated by the Taddonio family for multiple generations.

25. Since at least 2015, Tony Taddonio has been the Chief Executive Officer of Mile Hi.

4

26. Since at least 2015, Kristy Taddonio Mullins, daughter of CEO Taddonio, has been the President of Mile Hi.

27. Defendants share common management and centralized control of labor relations.

28. Defendants' common management includes, but is not limited to, their CEO, President, Vice President, and Human Resources Manager.

29. Defendants also share a human resources department.

30. The shared human resources department has authority over hiring decisions for all Defendants.

31. The shared human resources department maintains applicant and personnel records for all Defendants.

32. The shared human resources department screens and tests job applicants for all Defendants.

33. Defendants share a centralized authority to develop personnel policy for all Defendants.

34. Defendants share use of workspace, equipment, and storage.

35. At all relevant times, Defendants comprised an integrated enterprise.

## Mile Hi's Discriminatory Hiring

36. Marianne Apodaca was hired as the Human Resources Manager for Mile Hi on September 21, 2015.

37. Apodaca's direct supervisor was Vice President Michael Blanton.

38. Within months of being hired, Apodaca was told by Vice President Blanton that she needed "to be careful how many Blacks" she hires because CEO Taddonio "does not like a lot of Blacks in the warehouse."

5

39. Apodaca responded to Vice President Blanton that Mile Hi cannot discriminate on who it hires because it is against the law.

40. Vice President Blanton again warned Apodaca to "be careful."

41. On another occasion, Vice President Blanton told Transportation Manager Matt Jimenez that he should "be careful who he hires, because Blacks will not do the job."

42. In September 2018, Vice President Blanton told Apodaca and Recruiter Katherine Hennessey that "Blacks are not the most efficient or best people to hire."

43. In September 2018, Vice President Blanton also told Apodaca and Recruiter Hennessy that Mile Hi needs to be careful because Black hires do not want to work and will leave after a couple days.

44. In March 2019, CEO Taddonio remarked to Apodaca that Mile Hi's employee turnover was all Black people quitting and Black people don't want to work.

45. When Apodaca told CEO Taddonio's daughter, President Mullins, about this comment, President Mullins responded "Yeah, I know."

46. On March 29, 2019, Vice President Blanton told Apodaca that CEO Taddonio had said that Apodaca was hiring too many Black employees and that CEO Taddonio did not like it.

47. On March 29, 2019, Vice President Blanton told Apodaca that she needed to stop hiring Black candidates.

48. On April 1, 2019, CEO Taddonio entered Apodaca's office and had a conversation with her.

49. In the April 1, 2019 conversation, CEO Taddonio said he "was not prejudiced," but that Mile Hi "cannot be hiring Blacks because they do not work."

50. In the April 1, 2019 conversation, CEO Taddonio stated that the high employee

6

turnover at Mile Hi was due to Black hires.

51. In the April 1, 2019 conversation, CEO Taddonio told Apodaca that Mile Hi needed to be hiring more Hispanic workers and that he wanted Apodaca to focus on hiring younger Hispanic males.

52. In the April 1, 2019 conversation, CEO Taddonio told Apodaca that female workers cannot do the warehouse job and are not effective.

53. In the April 1, 2019 conversation, CEO Taddonio also expressed to Apodaca that women are less effective at manual labor jobs and that he preferred hiring women to clerical or administrative jobs.

54. On April 9, 2019, Manager Jimenez told Apodaca he was turning down a qualified Black applicant for a driving position due to the pressure from upper management against hiring Black applicants.

55. On or around April 12, 2019, CEO Taddonio told Recruiter Hennessey that if she is on the phone with an applicant and they "sounded Black," she should not bring them in.

56. On or around April 12, 2019, CEO Taddonio also told Recruiter Hennessey that if a Black / African American candidate comes in person for an interview, she should turn the person away.

57. On April 15, 2019, after being told about the comments by CEO Tadddonio to Apodaca and Recruiter Hennessey, President Mullins said she would "handle the situation."

58. On April 15, 2019, CEO Taddonio gave Apodaca a handwritten note with his policy directives for hiring.

59. The very first entry at the top of the handwritten note was a directive to make hiring decisions based on race.

60. Specifically, CEO Taddonio's handwritten note said: "1. Adhere to Denver Demographics. Ratio 52% White 10% Black 31% Hispanic or Latino [3%] Asian."

61. When giving the handwritten note to Apodaca, CEO Taddonio explained he was telling her to "only hire 10% Blacks."

62. On April 15, 2019, CEO Taddonio told Apodaca "No more Afghanistans at the Bakery."

63. CEO Taddonio explained that he wanted Hispanic females at the bakery because they "do a better job."

64. On April 16, 2019, CEO Taddonio told Apodaca that he had gone to four different McDonald's locations and not seen one Black person working at those locations.

65. CEO Taddonio told Apodaca that she needed to hire like McDonald's does.

66. During their April 16, 2019 conversation, CEO Taddonio told Apodaca that Black employees did not work hard and were more likely to quit their jobs, contributing to the high rate of employee turnover at Mile Hi.

67. In the April 16, 2019 conversation, CEO Taddonio gave Apodaca a recruiting flyer for McDonald's depicting a Hispanic woman and told Apodaca, "We need to hire like this."

68. On April 16, 2019, Apodaca interviewed three qualified Black and/or African American candidates.

69. When Apodaca told Vice President Blanton about the applicants, he asked "What do Tony's demographics say?"

70. Apodaca told Vice President Blanton that Mile Hi was over the percentage of Black and/or African American hires that CEO Taddonio wanted.

71. Vice President Blanton responded: "That should answer your question."

72. Apodaca asked if she should stop hiring Hispanics too because the company was also over the percentage of Hispanics in CEO Taddonio's note.

73. In response, Vice President Blanton just laughed.

74. In addition to Apodaca, CEO Taddonio also told Vice President Blanton to not hire Black applicants.

75. CEO Taddonio told Vice President Blanton that Black employees are "lazy workers" and "poor employees."

76. CEO Taddonio told Vice President Blanton that Black employees were the reason that the company had such high employee turnover.

77. In addition, CEO Taddonio told Vice President Blanton that Mile Hi should not hire "pretty girls" in the warehouse because then the warehouse workers do not get any work done.

78. CEO Taddonio told Vice President Blanton that Mile Hi should only hire "fat girls" for the warehouse.

79. CEO Taddonio also told Vice President Blanton that there were too many "Afghanistans" in the Bakery, and that needed to change.

80. The discriminatory directives from CEO Taddonio and Vice President Blanton described in the preceding paragraphs shaped Mile Hi's hiring practices.

81. Since at least 2015, female applicants were not hired for warehouse positions at Mile Hi because of the discriminatory pattern or practice described above.

82. Since at least 2015, female applicants were not hired for driving positions at Mile Hi because of the discriminatory pattern or practice described in the preceding paragraphs.

83. Based on discriminatory directives from management, Mile Hi refused to hire

Black and/or African American applicants because of their race and/or color.

84. Based on discriminatory directives from management, Mile Hi refused to hire Afghan applicants for bakery positions because of their national origin.

**Retaliatory Harassment and Discharge of Marianne Apodaca**

85. On April 3, 2019, Apodaca interviewed a fully qualified Black and/or African American candidate for a warehouse position.

86. That same day, after Apodaca told Vice President Blanton about the candidate, Vice President Blanton asked Apodaca if she was willing to "put her name on him" as an employee.

87. Apodaca asked Vice President Blanton if that meant she would lose her job if the candidate didn't work out, and Vice President Blanton responded by nodding his head affirmatively.

88. On April 15, 2019, in a meeting with President Mullins, Apodaca expressed her fear that CEO Taddonio would fire Apodaca and Recruiter Hennessey if they hired Black and/or African American applicants.

89. Apodaca also asked President Mullins if Apodaca and Hennessey should worry about their jobs.

90. President Mullins responded "Yes."

91. Also on April 15, 2019, President Mullins told Apodaca that Mullins' father, CEO Taddonio, always needs someone to blame, and Human Resources is always the one to blame.

92. On April 15, 2019, Apodaca asked President Mullins if Apodaca was being scapegoated.

93. President Mullins responded "Yes."

10

94. On April 16, 2019, Apodaca told Vice President Blanton about three qualified Black and/or African American applicants she had interviewed and asked Blanton if she should look for another job.

95. Vice President Blanton responded "Yes."

96. On April 22, 2019, President Mullins met with Apodaca to discuss her potential discharge.

97. In the April 22, 2019 meeting, President Mullins said she had spoken with CEO Taddonio about Apodaca's termination.

98. Apodaca told President Mullins that Mile Hi was creating a hostile work environment for her because she had refused to stop hiring Black applicants.

99. Mile Hi discharged Apodaca on April 24, 2019.

100. President Mullins told Apodaca that the reason for her termination was the company's high employee turnover and that Apodaca's performance in every other aspect of the job was great.

101. Mile Hi did not put Apodaca on a performance improvement plan before her discharge.

102. Apodaca's direct supervisor, Vice President Blanton, did not believe Apodaca's performance merited her discharge in April 2019.

103. Apodaca's direct supervisor, Vice President Blanton, made no recommendation that Mile Hi discharge Apodaca in April 2019.

## Mile Hi's Recordkeeping Violation

104. Since at least October 25, 2019, Mile Hi has not preserved personnel records relevant to Ms. Apodaca's charge of discrimination.

105. Since at least 2015, Mile Hi has not preserved for a period of one year the job application forms submitted by applicants and other hiring-related records.

106. Since at least 2015, for job applicants who were not hired, Mile Hi shredded applications after three months.

107. Since at least 2015, for job applicants who were not hired, Mile Hi shredded interview notes after three months.

108. On August 26, 2019, Apodaca's attorney sent Mile Hi a letter demanding preservation of evidence.

109. Among other items, the August 2019 letter from Apodaca's attorney specifically demanded Mile Hi preserve any and all records relating to new hire applications from 2015 to present and all applicant tracker software and data from September 2015 to present.

110. On November 8, 2019, the EEOC sent Mile Hi a Notice of Charge of Discrimination, which directly informed Defendants that EEOC regulations require preservation of all personnel records relevant to the charge until final disposition of the charge or litigation.

111. As of this filing, there has been no final disposition of Apodaca's charge of discrimination, or this litigation.

112. On March 31, 2021, the EEOC sent Mile Hi a letter reminding Defendants of the obligation to preserve records relating to Apodaca's charge.

113. On August 31, 2021, President Mullins participated, under oath, in an interview with EEOC investigators.

114. President Mullins confirmed that she had been "directly" involved with the HR department for at least the last two years.

115. On August 31, 2021, President Mullins confirmed that for at least the last two

years, Mile Hi had been shredding application records after three months.

116. President Mullins also confirmed that shredding application records after three months was what Mile Hi was then doing as of August 31, 2021.

117. President Mullins explained the policy of shredding application records after three months was the same for all Defendants.

118. President Mullins did not know if there was a specific reason why Mile Hi picked three months as the amount of time it retained applicant records.

119. President Mullins confirmed she was aware that Apodaca's attorney had sent a letter notifying Mile Hi to preserve records.

120. President Mullins confirmed she was aware that the EEOC had sent a letter reminding Mile Hi of its legal requirement to preserve all relevant records.

### FIRST CLAIM FOR RELIEF
### Failure to Hire Based on Sex (42 U.S.C. §§ 2000e-2(a))

121. The allegations contained in the foregoing paragraphs are hereby incorporated by reference.

122. Defendants failed or refused to hire female applicants because of their sex, in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a).

123. Since at least 2015, Defendants engaged in a pattern or practice of failing or refusing to hire female applicants for warehouse and driving positions because of their sex.

124. The effect of the practices complained of in the paragraphs above has been to deprive female applicants of equal employment opportunities and otherwise adversely affect their status as applicants for employment because of their sex.

125. The effect of the practices complained of in the paragraphs above has been to cause female applicants emotional pain, suffering, inconvenience, mental anguish, and loss of

13

enjoyment of life, and to deprive them of the financial and other benefits of working for Defendants.

126. The unlawful employment practices complained of in the forgoing paragraphs were intentional.

127. The unlawful employment practices complained of in the forgoing paragraphs were done with malice or with reckless indifference to the federally protected rights of female applicants.

**SECOND CLAIM FOR RELIEF**
**Failure to Hire Based on Race and/or Color (42 U.S.C. § 2000e-2(a))**

128. The allegations contained in the foregoing paragraphs are hereby incorporated by reference.

129. Defendants have failed or refused to hire Black and/or African American applicants because of their color and/or race in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a).

130. The effect of the practices complained of in the paragraphs above has been to deprive Black and/or African American applicants of equal employment opportunities and otherwise adversely affect their status as applicants for employment because of their race and/or color.

131. The effect of the practices complained of in the paragraphs above has been to cause Black and/or African American applicants' emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life, and to deprive them of the financial and other benefits of working for Defendants.

132. The unlawful employment practices complained of in the foregoing paragraphs were intentional.

133. The unlawful employment practices complained of in the foregoing paragraphs were done with malice or with reckless indifference to the federally protected rights of Black and/or African American applicants.

### THIRD CLAIM FOR RELIEF
### Failure to Hire Based on National Origin (42 U.S.C. § 2000e-2(a))

134. The allegations contained in the foregoing paragraphs are hereby incorporated by reference.

135. Defendants failed or refused to hire Afghan applicants for Bakery positions, because of their national origin, in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a).

136. The effect of the practices complained of in the paragraphs above has been to deprive Afghan applicants of equal employment opportunities and otherwise adversely affect their status as applicants for employment because of their national origin.

137. The effect of the practices complained of in the paragraphs above has been to cause Afghan applicants emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life, and to deprive them of the financial and other benefits of working for Defendants.

138. The unlawful employment practices complained of in the foregoing paragraphs were intentional.

139. The unlawful employment practices complained of in the foregoing paragraphs were done with malice or with reckless indifference to the federally protected rights of Afghan applicants.

## FOURTH CLAIM FOR RELIEF
### Retaliation (42 U.S.C. § 2000e-3(a))

140. The allegations contained in the foregoing paragraphs are hereby incorporated by reference.

141. Defendants unlawfully retaliated against Apodaca in violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a), by engaging in retaliatory harassment and discharging her for opposing unlawful employment practices.

142. By opposing the unlawful employment practices directed by CEO Taddonio and Vice President Blanton, Apodaca engaged in protected conduct under Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a).

143. After Apodaca opposed Defendants' discriminatory hiring directives and practices, Defendants harassed and discharged Apodaca in retaliation for her protected conduct.

144. The effect of the practices complained of in the paragraphs above has been to deprive Apodaca of equal employment opportunities and otherwise adversely affect her status as an employee because of her engagement in protected activity.

145. The effect of the practices complained of in the paragraphs above has been to cause Apodaca emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life, and to deprive her of the financial and other benefits of working for Defendants.

146. The unlawful employment practices complained of in the foregoing paragraphs were intentional.

147. The unlawful retaliation complained of in the foregoing paragraphs were done with malice or with reckless indifference to Apodaca's federally protected rights.

**FIFTH CLAIM FOR RELIEF**
Recordkeeping Violation (42 U.S.C. § 2000e-8(c))

148. The allegations contained in the foregoing paragraphs are hereby incorporated by reference.

149. Since at least 2015, Defendants have failed, in violation of Section 709(c) of Title VII, 42 U.S.C. § 2000e-8(c), to preserve employment application forms and other records having to do with hiring as well as to make and preserve records relevant to the determination of whether unlawful employment practices have been or are being committed.

150. The unlawful employment practices complained of in the paragraphs above were and are intentional.

**PRAYER FOR RELIEF**

Wherefore, the Commission respectfully requests that this Court:

A. Grant a permanent injunction enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from denying employment to female, Black, African American, and Afghan applicants based on their protected status, as well as from retaliating against employees for opposition to unlawful practices.

B. Order Defendants to institute and carry out policies, practices, and programs that provide equal employment opportunities for women, Black persons, African Americans, Afghan persons, and any employee or applicant who opposes unlawful discrimination, and that eradicate the effects of its past and present unlawful employment practices.

C. Order Defendants to make whole Marianne Apodaca, as well as female, Black, African American, and Afghan applicants denied employment as a result of Defendants' unlawful employment practices, by providing appropriate backpay with prejudgment interest, in

17

amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including but not limited to reinstatement, instatement or hire, or frontpay in lieu thereof.

   D. Order Defendants to make and preserve all records relevant to the determination of whether unlawful employment practices have been or are being committed, in accordance with Section 709(c) of Title VII, 42 U.S.C. § 2000e-8(c).

   E. Grant any adverse inference allowed by law as a result of Defendants' failure to preserve and retain records that are relevant to this case.

   F. Order Defendants to make whole Marianne Apodaca, as well as female, Black, African American, and Afghan applicants denied employment as a result of Defendants' unlawful employment practices, by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, in amounts to be determined at trial.

   G. Order Defendants to make whole Marianne Apodaca, as well as female, Black, African American, and Afghan applicants, by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of above, including but not limited to emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in amounts to be determined at trial.

   H. Order Defendants to pay Marianne Apodaca, as well as female, Black, African American, and Afghan applicants, punitive damages for Defendants' malicious and reckless conduct, as described above, in amounts to be determined at trial.

   I. Grant such further relief as the Court deems necessary and proper in the public interest.

J.  Award the Commission its costs of this action.

Respectfully submitted, this 30th day of September, 2024.

Karla Gilbride
General Counsel

Christopher Lage
Deputy General Counsel

Gwendolyn Young Reams
Associate General Counsel

Mary Jo O'Neill
Regional Attorney

Rita Byrnes Kittle
Assistant Regional Attorney

*/s/ Michael LaGarde*
Michael LaGarde
Trial Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Denver Field Office
950 17th Street, Suite 300
Denver, CO 80202
(720) 779-3631
michael.lagarde@eeoc.gov

PLEASE NOTE:

For purposes of service upon the EEOC, it is sufficient that pleadings, notices, and court documents be served upon the Trial Attorneys. Duplicate service is not required on the General Counsel, Deputy General Counsel, or Associate General Counsel in EEOC's Washington, D.C. office.